# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

|  |  |
|---|---|
| THERESA CHOMA,<br><br>Plaintiff,<br><br>vs.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security,<br><br>Defendant. | No. C05-3024-PAZ<br><br>**MEMORANDUM OPINION AND<br>ORDER** |

---

## I.  INTRODUCTION

This matter is before the court for judicial review of a decision by an administrative law judge ("ALJ") denying the plaintiff Theresa Choma's application for Title XVI supplemental security income ("SSI") benefits.  Choma claims the ALJ erred in (a) finding she does not meet the "B" level criteria for certain of the Listings, (b) giving her treating providers' opinions less than controlling weight, and (c) posing an inaccurate hypothetical question to the vocational expert (the "VE").  (*See* Doc. No. 13)

## II.  PROCEDURAL AND FACTUAL BACKGROUND
### A.  Procedural Background

On December 21, 2001, Choma protectively filed an application for SSI benefits, alleging a disability onset date of October 1, 2000.  Choma claims she is disabled due to post-traumatic stress disorder, major depression, panic and anxiety disorder, and suicide attempts, and these conditions prevent her from working because she is unable to handle stress and noise.  Choma's application was denied initially and on reconsideration.

Choma requested a hearing, and a hearing was held before ALJ Mark C. Ramsey on June 20, 2004.  Choma was represented at the hearing by attorney Niki Fisher.  Choma

testified at the hearing, and VE George B. Paprocki also testified. On October 20, 2004, the ALJ ruled Choma was not entitled to benefits. Choma appealed the ALJ's ruling, and on March 10, 2005, the Appeals Council denied Choma's request for review, making the ALJ's decision the final decision of the Commissioner.

Choma filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) On August 24, 2005, with the parties' consent, Judge Donald E. O'Brien transferred the case to the undersigned for final disposition and entry of judgment. (Doc. No. 6) Choma filed a brief supporting her claim on November 28, 2005. (Doc. No. 13) The Commissioner filed a responsive brief on January 24, 2006. (Doc. No. 14) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Choma's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Choma's hearing testimony

Choma was 36 years old and single at the time of the hearing. She lived in a house with her boyfriend, a nineteen-year-old daughter, and a seventeen-year-old son. Choma has an eighth grade education. She has taken courses in cosmetology, and correspondence courses in criminal justice. She failed most of her criminal justice courses, and at the time of the hearing, she had abandoned her pursuit of a correspondence degree.

Choma's work history is sporadic. For more than six months from 1990 to 1991, she was a motel housekeeper. For about six months from 1993 to 1994, she was a production worker in a factory. For less than six months in 1994, she was a cashier at a convenience store. For less than six months in 1999, she worked as a factory welder. She worked as a cosmetologist intermittently from 1997 to 2000. She worked as a motel housekeeper again from 2001 to 2002. She quit that job in December 2002, because it was too stressful.

At home, Choma does laundry a couple of times a week. She cooks one or two meals a day. For about twenty-five minutes each month, she goes grocery shopping with her boyfriend. She sometimes waters and weeds her flower garden. Other than this, she seldom leaves the house because it leads to panic attacks and hallucinations. She sits at home and watches movies. She goes out for pizza about once every three months. Sometimes she will sit on her porch and talk with a friend. She does not belong to any organizations or clubs, and she does no volunteer work. She likes to crochet and latch hook. She does not participate in any other activities.

The ALJ questioned Choma about activities referenced in her medical records. She admitted she used to ride a bike two miles each day, but she testified that had lasted only for a little while. She denied walking each day, swimming regularly, working in her flower garden (other than the periodic watering and weeding), or continuing with her correspondence courses. She denied taking care of a neighbor's daughter after school. She admitted she had been involved in a charity fund raiser for a neighbor, but denied she had been the organizer of the fund raiser as indicated in her therapy progress notes.

Choma admitted to alcohol and methamphetamine use in the past, but she denied having used alcohol for the previous three or four years, and she denied using methamphetamine for the previous four or five years.

Choma testified she is unable to work because it is too stressful. She stated, "I have hallucinations and I hear things when I get real stressed out." She stated she gets stressed out by people and noise, and she has both visual and auditory hallucinations almost daily. When she has auditory hallucinations, the voices tell her she is "stupid," and that she would "be better off dead." She also testified she has two or three days a week when she does not have hallucinations. She has trouble sleeping, and often wakes up from nightmares. She cries often, for periods lasting from an hour to all day. She has racing thoughts and frequently loses her temper. A few times a week, she has panic attacks,

which she described as follows: "They hurt. I have them so bad, I sometimes have to go the hospital because it feels like I'm having a heart attack." Sometimes she is suicidal. A couple of times a week, she will isolate herself and stay in her bedroom and sleep. She testified, "I cry a lot. I can't breathe. I sleep a lot. When I'm not sleeping, I'm eating. I sit in the dark. I yell a lot, scream actually."

Choma testified that although her medications are helpful, they make her tired and she feels like she is on drugs. They also give her dry mouth and a headache.

## 2.    *Choma's medical history*

On February 15, 2000, Choma was admitted to the hospital in emergency protective custody because of a suicide attempt. She was stabilized and was discharged two days later "good condition." She was admitted to the hospital again on April 13, 2000, for an anxiety attack. She was given an injection of Ativan, and her symptoms resolved.

Choma was seen in the emergency room on February 27, 2000, for an injury to her foot. At that time, she reportedly was taking no medications other than over-the-counter non-aspirin pain relievers. At another emergency room visit on July 18, 2000, for a matter unrelated to this case, Choma indicated she was taking Paxil, and she considered herself to be in good health. She reportedly had stopped drinking alcohol a year previously, and she denied using any street drugs.

Choma was seen in the emergency room on November 26, 2000, for a cough, nausea, vomiting, and headache. At that time she reported taking Trazodone and Paxil. She told the ER staff that she was working as a cosmetologist, and she had not taken any time off from work for her ongoing cold symptoms and complaints. She was seen in the ER again on May 13, 2001, with complaints of right pelvic and abdominal pain. At that time, she reportedly was taking no medications.

On January 9, 2002, Choma was seen at the hospital because she "took some pills." The following history was taken:

> This is a 33-year-old white female who apparently took pills at about 1730 tonight. She said that she cannot remember even taking the pills at all, but she remembers that her dad, who is deceased, told her to do so. She is guessing that she took 15 trazodone, 10 Paxil, 5-6 naproxen and 3 hydrocodone that she had leftover from a hysterectomy in November. She says she hears voices, most recently she has been hearing her dad. She says that she has visual hallucinations in which she sees her grandfather molesting her over and over again. The way she describes it though it sounds like she is reliving this memory. I asked her if she did not remember taking the pills how she ended up going to the emergency room. She said she was on the phone and told her mom that her dad told her to take the pills. Her boyfriend then took her to the local emergency room and she ended up here.

She was diagnosed as suffering from major depression and personality disorder not otherwise specified, and was prescribed BuSpar, Paxil, and Trazodone.

On January 25, 2002, Choma was admitted to a locked psychiatric unit following "increased suicidal ideation." Gagandeep Singh, M.D., the staff psychiatrist, stated the following in his psychiatric evaluation:

> The patient reports a long history of depression and substance use. In addition, she has had past trauma issues. There has been rekindling of these lately in the context of discovering that her daughter was abused. Patient has had multiple recent hospitalizations at Ellsworth Municipal Hospital and until recently participated in the partial hospitalization program. She was discharged from that program and went to Nebraska to visit an ailing uncle. During this time also met with DHS workers involved in her daughter's care. At this time she learned she would not be able to take care of her daughter until she turned 18. This was extremely distressing for her. In this context she had marked increase in anger, hopelessness, and helplessness. She felt suicidal and homicidal.

She was discharged on January 28, 2002, on BuSpar, Paxil, and Zyprexa, with a GAF of 40.

In a psychosocial assessment written during Choma's hospitalization, a social worker noted Choma believed her long-deceased father was telling her to kill herself by overdosing on medications. Choma also was sleeping continuously. The social worker noted Choma had overdosed on medications three times during the previous four years, and she was at risk to overdose again. At the time of Choma's current admission, she again was hearing voices telling her to harm herself. Choma also was talking about harming or killing an ex-husband who had abused Choma and her daughter. Choma was experiencing difficulties in her current relationship as well. Her boyfriend was hiding her medications so Choma would not overdose. The social worker planned to encourage Choma to attend group therapy sessions, to express her thoughts and feelings in group, and to return to the partial hospitalization program. The record indicates Choma "refused her first group on the morning following her day of admissions here. She had reportedly been guarded and uninvolved in the evening group that immediately followed her admission. She [was] wanting to isolate from others in her bedroom."

On January 30, 2002, Dr. Singh completed an evaluation form for the Disability Determination Services Bureau ("DDS"), in which the doctor indicated Choma could remember and understand instructions, procedures, and locations, and was capable of handling cash benefits. He stated Choma struggled with carrying out instructions and with maintaining attention, concentration, and pace. He further indicated Choma had occasional, sometimes significant, problems with using good judgment and responding appropriately to changes in the work place, and she had significant problems interacting appropriately with supervisors, coworkers, and the public. He listed Choma's current diagnoses as Major Depressive Disorder, and PTSD.

On March 20, 2002, John Tedesco, Ph.D. completed a Psychiatric Review Technique form for DDS. From his review of the record, Dr. Tedesco determined that Choma suffered from "12.04 Affective Disorders," "12.06 Anxiety-related Disorders," and "12.0 Personality Disorders." Under the "B" criteria of the Listings, he found Choma had moderate restriction of her activities of daily living; moderate difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration. He found she was moderately limited in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. However, although he determined her impairments were severe, Dr. Tedesco opined Choma's impairments were not expected to last twelve months or longer.

On June 4, 2002, Choma saw Dr. Singh with complaints of increased stress in her family life. She was having occasional "death wishes but no suicidal intent or plan," and an increase in her auditory hallucinations. Dr. Singh increased Choma's Trileptal dosage.

On June 12, 2002, Choma began seeing mental health therapist Rick Shaw. Choma reportedly was hearing voices. Her judgment and insight regarding her problems was noted to be fair. After one visit, on June 26, 2002, she was admitted to the hospital because of suicidal thoughts. She was assessed by the admitting physician as suffering from major depression, post-traumatic stress disorder, and personality disorder NOS. Upon discharge, Dr. Singh noted Choma's condition had improved, and he adjusted her medications. Her GAF was 30 upon discharge.

On July 19, 2002, Choma saw her therapist, Mr. Shaw. She seemed to be improving and was attempting to increase her activities. On August 1, 2002, she saw

Dr. Singh, and he also felt she was improving. She saw Mr. Shaw on August 2, 2002, and was feeling less depressed, but on August 15, 2002, she saw him again, and was very depressed. She saw Dr. Singh the following day, and stated the stress of possibly returning to work had caused her to feel "more down, tearful, and helpless." She was hearing voices, including the voice of her abusive grandfather. Her medications at the time were Trileptal, Effexor, Seroquel, and Protonix.

Choma saw her therapist on August 22, 2002, and reported feeling better. When she saw Dr. Singh on August 30, 2002, she was continuing to do better, and had begun looking for part-time work. On September 3, 2002, Dr. Singh noted Choma had started back to work that day, and things had gone better than she had expected. On October 8, 2002, Choma told her therapist that she had started work cleaning motel rooms three to four days a week, for three to four hours each day. The structure and added activity seemed to help with her depression, although she continued to have some ups and downs in her moods. Then, on November 5, 2002, she reported to Dr. Singh that she had been feeling more irritable and restless. The next day, she saw Mr. Shaw and again reported irritability. She was having stressors relating to a custody battle over her daughter, and problems with a mentally challenged son. The therapist felt Choma's judgment and insight in these areas were improving.

On November 11, 2002, Rhonda Lovell, Ph.D. completed a Psychiatric Review form for DDS. Her findings were similar to those of Dr. Tedesco. She concluded as follows:

> Based upon all available evidence, the claimant appears to have a serious mental impairment that does not currently meet listing level severity. [Activities of daily living] and past work history show that the claimant has the ability to understand and remember instructions and procedures for basic and detailed tasks. [Activities of daily living] and treatment notes suggest that the claimant's ability to sustain concentration is reduced during periods of crisis, but concentration is generally

sufficient to carry out basic and some detailed tasks. The claimant's past work history and presentation at treatment shows generally adequate social skills. Based on her [activities of daily living] and treatment history, the claimant's mental impairment will periodically interfere to a moderate degree with her ability to complete a typical work week. This assessment is consistent with treatment records and general opinion of her treating psychiatrist who is thus afforded controlling weight.

On November 21, 2002, Choma saw Dr. Singh, and reported that she was depressed over a family conflict. Although she was anxious in affect and dysphoric in mood, and was having some suicidal thoughts, she was using good coping mechanisms. Choma saw Dr. Singh on December 6, 2002, and reported she had been doing reasonably well until about two weeks earlier, when she started having "weird nightmares," together with increased irritability. Dr. Singh adjusted her medications. Choma saw her therapist on December 11, 13, and 20, 2002, and on January 6, 2003. Over this period of time, her condition worsened. Dr. Singh saw her on January 14, 2003, and noted her condition had deteriorated. She was off work, was suffering from helplessness and hopelessness, and had some death wishes.

On February 10, 2003, Choma saw Dr. Singh, and reported things were going better. She was not working, and was focusing on her mental health needs. Choma next saw Dr. Singh on April 14, 2003, and reported she was doing much better. On May 29, 2003, Dr. Singh concluded that Choma's condition was relatively stable, other than drowsiness in the morning. Choma saw her therapist on June 17, July 8, and July 30, 2003, and showed consistent progress in her mood, her relationships, and her activity level. She was working on her correspondence courses and walking for exercise. She still reported hearing voices, but she was able to use relaxation techniques to decrease the intensity of those voices.

On January 5, 2004, Choma saw her therapist, who noted the following:

> Also we talked about Theresa's activity level recently. She
> continues on her correspondence courses but is going to take
> some of the final tests over that she has failed. We talked
> about allowing herself more time to complete these courses
> and enjoying the process more, rather than rushing to complete
> the tests. This is so Theresa can take more time and can be
> more prepared when she does take the tests. We also talked
> about activities that she has been doing recently. Theresa
> recently organized a fundraiser for a family in her hometown,
> who had a fire, with a friend of hers. Theresa surprised
> herself at how well she did at the chili supper, interacting with
> people and this therapist encouraged her to look for other
> opportunities to volunteer. Theresa is thinking of working at
> her community club's fish fry, which is coming up. I
> encouraged her to do this, even if it were for just a few hours.

Mr. Shaw believed Choma was "relatively stable."

On March 2, 2004, Mr. Shaw noted Choma had been quite "discouraged recently
because she flunked a semester test in four out of five courses which she ha[d] been taking
in a criminal justice correspondence course." The therapist observed that Choma "was
anxious in affect and dysphoric in mood."

### 3.    *Vocational expert's testimony*

The VE testified Choma's past relevant work history consisted of three jobs, with
the primary one being cosmetologist. She also worked as a production assembler and as
a hotel maid. The ALJ asked the VE the following hypothetical question:

> [Choma]'s capable of performing jobs that do not require long
> periods of concentration so I'm going to interpret that to mean
> simple, unskilled work and jobs that do not require working
> closely with a lot of people[,] so that would be jobs where
> she's not dealing with the public or working in unison with
> fellow employees and – would she be able to perform the
> cosmetologist's job?

The VE responded, "No. That's a job where she was working with the public on a continuous basis." However, the VE testified it would be "feasible" for Choma to work as a production assembler or as a hotel maid.

On cross examination by Choma's lawyer, the VE testified that if Choma were unable to handle ordinary stress on the job more than twenty percent of the time, or if she were unable to maintain attention and concentration on the job more that eighty percent of the time, she could not perform her past work. The VE also testified that if Choma were unable to maintain a consistent pace or finish tasks a majority of the time due to psychologically-based problems, she could not perform her past work. The VE stated:

> [E]mployers need for someone who exhibits normal 'behavior' in terms of a person being there on time, getting there routinely and being able to function without an inordinate amount of supervision. Going through a normal workday is the most important function[], in many instances, in competitive employment. If you have someone who isn't able to carry out those tasks, they're not going to be maintained even in sheltered employment nowadays.

### 4.   The ALJ's decision

The ALJ found Choma has not engaged in substantial gainful activity at any time relevant to this case. The ALJ also found Choma to have the following medically-determinable impairments: "multiple mental impairments, including schizoaffective disorder, bipolar type; post-traumatic stress disorder (PTSD); and personality disorder, NOS." He further found that because these impairments can impose significant vocational-related limitations, they are considered "severe." However, the ALJ further found Choma's impairments, singly or in combination, do not reach the level of severity required by the Listings:

> Ms. Choma has been diagnosed with schizoaffective disorder, bipolar type, characterized by sleep disturbance, mood swings,

mind racing, thoughts of suicide, and hallucinations, which fulfill the clinical "A" criteria of section 12.04, *Affective Disorders*. She also has PTSD characterized by recurrent and intrusive recollections of molestation by her grandfather, which fulfills the "A" criteria of sections 12.06, *Anxiety-Related Disorders*, and a personality disorder, NOS, which fulfills the "A" criteria of 12.08, *Personality Disorders*. However, her functional limitations are not of the requisite severity to meet either the "B" or "C" criteria of these listings.

The ALJ found Choma has "no more than 'moderate' limitations in her activities of daily living, even on her 'bad' days." He similarly found Choma has "no more than 'moderate' limitations" in social functioning and in her ability to maintain concentration, persistence, and pace. He also found Choma has not experienced repeated, extended episodes of deterioration or decompensation, and she does not require a highly-structured and supportive environment to function adequately. Accordingly, the ALJ concluded Choma's mental impairments do not meet the severity requirements of Listings 12.04, 12.06, or 12.08.

The ALJ found Choma retains "the residual functional capacity to perform work at any exertional level, except that she is limited to simple repetitive tasks without close public or coworker contact." Based on this finding, the ALJ found Choma can perform her past relevant work as a production assembly worker and as a hotel maid, both as she actually performed those jobs in the past and as they generally are performed in the national economy. Having found Choma can return to her past relevant work, the ALJ stopped at step four of the sequential evaluation process, and found Choma was not disabled within the meaning of the Social Security Act at any time through the date of his decision.

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such

abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain

non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial

evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe*

*v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)).  Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).  This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213).  The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987).  Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole.  *See*

*Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)).  As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)    the claimant's daily activities;
> 2)    the duration, frequency and intensity of the pain;
> 3)    precipitating and aggravating factors;
> 4)    dosage, effectiveness and side effects of medication;
> 5)    functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984).  *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).  The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).


## IV.  ANALYSIS

Choma argues the ALJ erred in three respects.  First, she claims the ALJ failed to assess her functional limitations properly under the "B" criteria of Listings 12.04, 12.06, and 12.08.  Second, she argues the ALJ erred in failing to give the opinions of Dr. Singh and Mr. Shaw, her treating medical providers, controlling weight.  Third, Choma asserts the ALJ failed to specify her limitations accurately in his hypothetical question to the VE. Choma urges the court to reverse the Commissioner's decision and remand this case for calculation and award of benefits, or alternatively, for further proceedings.  The Commissioner disputes each of Choma's assertions of error.

The Commissioner's Listing of Impairments describes, for each of the body's major systems, impairments the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a) (2006). Each of the Listings upon which Choma bases her argument consists of "paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations)," as well as some "additional functional criteria (paragraph C criteria)" for Listings 12.04 and 12.06. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 "Mental Disorders" The Commissioner describes the functions of the three types of criteria as follows:

> The criteria in paragraph A substantiate medically the presence of a particular mental disorder. . . .
> The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A.

*Id.*, subs. (A), *Introduction*.

The ALJ found Choma fulfilled the criteria of paragraph A for each of the three Listings under which Choma was evaluated by the ALJ. However, for purposes of this case, each of those three Listings also requires that the disorder result in at least two of the following criteria under paragraph B[1]:

    1.      Marked restriction of activities of daily living; or

---

[1]Alternatively Listing 12.06 requires that the criteria of paragraph C be satisfied. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 ("The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied."). Listing 12.04 allows only the paragraph C criteria to be satisfied, as an alternative to satisfying both A and B. *Id.* § 12.04 ("The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied."). Because Choma does not contend the ALJ should have considered her impairments under the paragraph C criteria of either Listing 12.04 or Listing 12.06, the court will omit discussion of those criteria here.

2.     Marked difficulties in maintaining social functioning; or

3.     Marked difficulties in maintaining concentration, persistence, or pace; or

4.     Repeated episodes of decompensation, each of extended duration.

*Id.*, §§ 12.04(B), 12.06 (B), 12.08(B). Choma claims the ALJ failed to consider her functional limitations properly in these four areas, arguing had he done so, he would have reached the conclusion that she is disabled.

In her brief, Choma reviews the record evidence in light of each of the above criteria, reaching the conclusion that her impairments meet those criteria. However, as noted above, it is not the court's function on judicial review to reweigh the evidence or to review the factual record *de novo*. *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)); *Roe*, 92 F.3d at 675 (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Rather, the court must affirm the Commissioner's decision if it is supported by substantial evidence in the record – *even if* the court would have weighed the evidence differently, or substantial evidence would support an opposite decision. *See, e.g.*, *Culbertson*, 30 F.3d at 939 (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213); *Goff*, 421 F.3d at 789.

In this case, substantial evidence exists to support the ALJ's conclusion that Choma would have only moderate restrictions in maintaining her activities of daily living and social functioning. Of the "B" criteria, the only area in which the record supports a finding that Choma may have marked difficulties is in her ability to maintain concentration, persistence, or pace. Even in this area, the record indicates Choma's marked difficulties have occurred only from time to time, not for any continuous period of twelve months or longer. The ALJ made specific findings regarding Choma's limitations in each of the four

areas contained in the "B" criteria. The court overrules Choma's argument that the ALJ erred in this respect.

Choma next argues the ALJ erred in failing to give the opinions of Dr. Singh and Mr. Shaw controlling weight. The court agrees with the Commissioner that the form utilized by the plaintiff's counsel, in which the treating provider indicates the percentage of time a claimant can perform certain functions at "a satisfactory level of functioning," is of questionable value. *Cf. Fischer v. Barnhart*, 256 F. Supp. 2d 901, 906-07 (E.D. Wis. 2002) ("[A]n opinion may be reasonably rejected by the ALJ when the form is drafted by the plaintiff's attorney and merely requires a check mark or an affirmative response by the doctor.") There is no definition of what constitutes "a satisfactory level of functioning," nor does that terminology comport with the assessment required by the regulations; that is, whether a claimant's functional abilities are markedly limited in each area. The Commissioner considered all of the treatment notes in reaching his decision, giving proper weight to the treating providers' opinions. *See Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (treating physician's opinion is entitled to great weight but does not control automatically, as record must be evaluated as a whole). The court overrules Choma's argument that the ALJ erred in the weight he gave to the opinions of Dr. Singh and Mr. Shaw.

Choma also argues the ALJ posed an inaccurate hypothetical question to the VE that did not include all of Choma's limitations as supported by the record. "[T]he testimony of a vocational expert is not required to establish that a claimant can return to her former work." *Banks v. Massanari*, 258 F.3d 820, 827 (8th Cir. 2001). In *Banks*, the claimant made an argument similar to Choma's argument here:

> Banks next argues that the ALJ was required to rely on the VE's testimony at step four in assessing whether she could return to her prior relevant work because she has nonexertional impairments. We begin by noting that it is clear in our circuit that vocational expert testimony is not required at step four

where the claimant retains the burden of proving she cannot perform her prior work. *See Gowell [v. Apfel]*, 242 F.3d [793,] 799 [(8th Cir. 2001)]; *Gaddis v. Chater*, 76 F.3d 893, 896 (8th Cir. 1996); *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994). Vocational expert testimony is not required until step five when the burden shifts to the Commissioner, and then only when the claimant has nonexertional impairments, which make use of the medical-vocational guidelines, or "grids," inappropriate. *See Beckley v. Apfel*, 152 F.3d 1056, 1069 (8th Cir. 1998); *Johnson v. Shalala*, 42 F.3d 448, 452 (8th Cir. 1994).

*Id.* The *Banks* court further clarified that although the Eighth Circuit has stated, in passing, that vocational expert testimony os "relevant at steps four and five of the Commissioner's sequential analysis," the court has not required vocational expert testimony at step four. *Id.*

Although vocational expert testimony was not required, the VE in this case obtained and relied upon such testimony in determining that Choma is able to return to her past relevant work. An ALJ may produce evidence of suitable jobs a claimant can perform by eliciting testimony from a VE "concerning availability of jobs which a person with the claimant's particular residual functional capacity can perform." *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998). The hypothetical question posed to the VE must include all of a claimant's impairments that are supported by substantial evidence in the record as a whole. *Grissom v. Barnhart*, 416 F.3d 834, 837 (2005) (citing *Tucker v. Barnhart*, 363 F.3d 781, 784 (8th Cir. 2004), in turn citing *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)). "However, the hypothetical question need only include those impairments which the ALJ accepts as true." *Id.* (citing *Rappaport v. Sullivan*, 942 F.2d 1320, 1323 (8th Cir. 1991)).

The ALJ determined that Choma "retains the residual functional capacity to perform work at any exertional level, except that she is limited to simple repetitive tasks without close public or coworker contact," noting the record indicates Choma "is not able to

perform detailed or complex work, or handle more than occasional social interaction." (R. 24) The ALJ included these limitations in the hypothetical question posed to the VE. The court therefore overrules Choma's assertion that the ALJ's hypothetical question to the VE was improper.

## *V. CONCLUSION*

For the reasons discussed above, the Commissioner's decision is **affirmed**.

**IT IS SO ORDERED.**

**DATED** this 28th day of September, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT